# United States Court of Appeals for the Federal Circuit

---

**PLEASURE-WAY INDUSTRIES, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1190

---

Appeal from the United States Court of International Trade in No. 1:10-cv-00173-RKM, Senior Judge R. Kenton Musgrave.

---

Decided: January 5, 2018

---

JOHN MICHAEL PETERSON, Neville Peterson LLP, New York, NY, argued for plaintiff-appellant. Also represented by RICHARD F. O'NEILL.

MARCELLA POWELL, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by CHAD A. READLER, JEANNE E. DAVIDSON, AMY M. RUBIN; MICHAEL W. HEYDRICH, Office of the Assistant Chief Counsel, United States Bureau of Customs and Border Protection,

United States Department of Homeland Security, New York, NY.

_____

Before TARANTO, CLEVENGER, and STOLL, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Pleasure-Way Industries, Inc., is a manufacturer and seller of Class B motorhomes, which it sells at dealerships in the United States and Canada.  Between January 2008 and September 2009, having bought 144 Daimler-Chrysler AG "Sprinter" vans in the United States, Pleasure-Way exported them to its manufacturing facility in Canada, where it converted them into its Plateau TS and Ascent TS model motorhomes.  The conversion included installation of interior features such as fully plumbed kitchen and bathroom fixtures with freshwater and sewage tanks, water heaters, sleeping quarters, countertops with propane burners, microwave ovens, wall-mounted televisions, and refrigerators.  The conversion also included installation of exterior features such as large picture windows and porch lights, awnings, running boards, and exterior showers.

When Pleasure-Way imported the resulting motorhomes into the United States, it sought to avoid their being treated, for purposes of import duties, under the facially applicable provision of the Harmonized Tariff Schedule of the United States (HTSUS), namely, subheading 8703.33.00.  It requested a ruling from the United States Bureau of Customs and Border Protection that the motorhomes should instead be classified under HTSUS subheading 9802.00.50, which provides favorable import-duty treatment to certain articles that, as relevant here, meet the requirements set forth in 19 C.F.R. § 181.64 (2017) for favorable treatment of imported articles that qualify as "[g]oods *re*-entered after repair or alteration in Canada or Mexico" (emphasis added).  Cus-

toms initially granted Pleasure-Way's request, but it then changed its position. Customs determined that the regulation does not apply to the motorhomes that resulted from Pleasure-Way's conversion in Canada of the vans it acquired in the United States. Customs therefore assessed a 2.5% ad valorem import duty in accordance with HTSUS subheading 8703.33.00.

The parties agree that the only issue before us is the applicability of the regulation. When Customs denied Pleasure-Way's protest, Pleasure-Way sued the United States in the United States Court of International Trade pursuant to 28 U.S.C. § 1581(a). The court held that the regulation is inapplicable and on that basis granted summary judgment against Pleasure-Way. *Pleasure-Way Indus., Inc. v. United States*, 38 I.T.R.D. (BNA) 1889, 2016 WL 6081818, at *6 (Ct. Int'l Trade Oct. 18, 2016).

Pleasure-Way appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5). Pleasure-Way agrees that "there are no material facts in dispute as to the nature of the merchandise." Appellant's Br. 10. We review the interpretation of the regulation and its application to the undisputed facts on summary judgment de novo. *Millenium Lumber Distr. Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009); *Lynteq, Inc. v. United States*, 976 F.2d 693, 696 (Fed. Cir. 1992). We affirm.

I

The first two subsections of the regulation at issue, 19 C.F.R. § 181.64, provide:

**§ 181.64 Goods re-entered after repair or alteration in Canada or Mexico.**

(a) *General.* This section sets forth the rules which apply for purposes of obtaining duty-free or reduced-duty treatment on goods returned after repair or alteration in Canada or Mexico as provided for in subheadings 9802.00.40 and

9802.00.50, HTSUS. Goods returned after having been repaired or altered in Mexico, whether or not pursuant to a warranty, and goods returned after having been repaired or altered in Canada pursuant to a warranty, are eligible for duty-free treatment, provided that the requirements of this section are met. Goods returned after having been repaired or altered in Canada other than pursuant to a warranty are subject to duty upon the value of the repairs or alterations using the applicable duty rate under the United States-Canada Free-Trade Agreement (see § 10.301 of this chapter), provided that the requirements of this section are met. For purposes of this section, "repairs or alterations" means restoration, addition, renovation, redyeing, cleaning, resterilizing, or other treatment which does not destroy the essential characteristics of, or create a new or commercially different good from, the good exported from the United States.

*Example.* Glass mugs produced in the United States are exported to Canada for etching and tempering operations, after which they are returned to the United States for sale. The foreign operations exceed the scope of an alteration because they are manufacturing processes which create commercially different products with distinct new characteristics.

(b) *Goods not eligible for duty-free or reduced-duty treatment after repair or alteration.* The duty-free or reduced-duty treatment referred to in paragraph (a) of this section shall not apply to goods which, in their condition as exported from the United States to Canada or Mexico, are incomplete for their intended use and for which the processing operation performed in Canada or

Mexico constitutes an operation that is performed as a matter of course in the preparation or manufacture of finished goods.

*Example*. Unflanged metal wheel rims are exported to Canada for a flanging operation to strengthen them so as to conform to U.S. Army specifications for wheel rims; although the goods when exported from the United States are dedicated for use in the making of wheel rims, they cannot be used for that purpose until flanged. The flanging operation does not constitute a repair or alteration because that operation is necessary for the completion of the wheel rims.

19 C.F.R. § 181.64(a)–(b). Subsection (c) specifies requirements of documentation and duty deposits upon entry.

The language and structure of this regulation make clear several things of relevance here. Subsection (a) establishes necessary requirements for eligibility for the favorable duty treatment—either duty-free treatment or imposition of duties only on the value of the foreign improvements (rather than the overall value of the imported good). The provision makes the favorable treatment depend on whether the foreign activities constitute "repairs or alterations" *as defined*. *Id*. § 181.64(a) ("'repairs or alterations' means . . ."). The definition itemizes examples ("restoration, addition, renovation, redyeing, cleaning, resterilizing, or other treatment"), *id.*, and then states two necessary requirements. One is that the foreign activities "not . . . create a new or commercially different good from[] the good exported from the United States." *Id*. The other is that the foreign activities "not destroy the essential characteristics of . . . the good exported from the United States." *Id*. These requirements are stated separately, but they obviously are related.

The two necessary requirements must apply to all items in the full phrase—"restoration, addition, . . . or other treatment"—not just to the last phrase, "other treatment." Because the full phrase is an integrated series of parallel terms, and the two requirements are "applicable as much to the first and other words as to the last," *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014), this reading is "the natural construction," *id.*, and also is supported by the general principle that "a 'postpositive modifier'—that is, one 'positioned after' multiple phrases or clauses . . . —modifies all the preceding clauses, unless a 'determiner' is repeated earlier in the sentence." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 858 (9th Cir. 2017) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 148–49 (2012)). And the language at issue here compels this reading for a particular reason: the presence of the item "addition" in the list. That item is so broad that the evident limiting function of the definition would be effectively negated if any "addition" gained the favorable duty treatment under subsection (a), even one that created a new or commercially different good or destroyed the essential characteristics of the good exported from the United States. We note, too, that a predecessor version of this regulation, quoted in *Press Wireless, Inc. v. United States*, 6 Cust. Ct. 102, 104 (1941), made clear that the language, "does not destroy the identity of the article exported or create a new or different article," applied to the entirety of the covered "repairs."[1] We have no reason

---

[1]    *Press Wireless* quotes the Tariff Act of 1930, para. 1615, as providing that "articles exported from the United States for repairs may be returned upon payment of a duty upon the value of the repairs at the rate at which the article itself would be subject if imported, under conditions and regulations to be prescribed." *Press Wireless*, 6 Cust. Ct. at 104. It then quotes a Customs regulation as

to think that Customs was changing the rule in this critical respect through the rewording embodied in 19 C.F.R. § 181.64(a).

Subsection (b) states an additional limitation on eligibility for the favorable duty treatment authorized in subsection (a). It declares certain "[g]oods not eligible for duty-free or reduced-duty treatment after repair or alteration." 19 C.F.R. § 181.64(b) (subsection title). The goods removed from eligibility, *i.e.*, to which the favorable treatment of subsection (a) "shall not apply," are those "which, in their condition as exported from the United States to Canada or Mexico, are incomplete for their intended use and for which the processing operation performed in Canada or Mexico constitutes an operation that is performed as a matter of course in the preparation or manufacture of finished goods." *Id.*

This subsection focuses on the goods "in their condition as exported" (before the foreign processing) and on whether they are "incomplete for their intended use" in that condition and whether the foreign processing operation is "performed as a matter of course in the preparation or manufacture of finished goods." *Id.* The provision has roots in *United States v. J.D. Richardson Co.*, 36 CCPA 15 (1948), which involved the flange situation now given as an example in subsection (b). The court in *J.D. Richardson* held that favorable treatment of alterations (under regulatory language similar to what is now in 19 C.F.R. § 181.64(a)) was unavailable where a U.S. manufacturer

---

providing that "'repairs' as used in paragraph 1615 is hereby defined to mean any change, renovation, cleaning, redyeing, etc., which is necessary to restore an article to its original condition after decay, injury, deterioration, or partial destruction, when such change, renovation, etc., does not destroy the identity of the article exported or create a new or different article." *Id.*

exported its "uncompleted articles," which "could not be used in their condition as exported," to be "manufactured into completed articles" that were then returned to the U.S. manufacturer to be used as parts. *J.D. Richardson*, 36 CCPA at 16–17. The same basis for exclusion was also relied on in *Dolliff & Co. v. United States*, 599 F.2d 1015, 1019 (CCPA 1979) ("[R]epairs and alterations are made to *completed articles* and do not include intermediate processing operations which are performed as a matter of course in the preparation or the manufacture of finished articles.").

## II

## A

The parties in this case have discussed three issues bearing on possible exclusion from favorable duty treatment under the regulation: (1) whether Pleasure-Way's conversion activities in Canada "create[d] a new or commercially different good from" the exported vans; (2) whether the conversion activities "destroy[ed] the essential characteristics" of the exported vans; and (3) whether the vans, "in their condition as exported from the United States to Canada," were "incomplete for their intended use." 19 C.F.R. § 181.64(a), (b). The Court of International Trade resolved all three of those issues against Pleasure-Way. *Pleasure-Way*, 2016 WL 6081818, at *3–6. We think it preferable, and here it suffices, to decide only the first issue—more precisely, whether Pleasure-Way, in changing the vans into motorhomes, created a commercially different good.

That issue calls for a focus on relatively familiar considerations concerning differentiation in the marketplace. That differentiation may be reflected in various kinds of evidence. Some kinds of evidence directly focus on what happens in the marketplace—such as consumer uses and how products are marketed and sold. Some kinds of evidence are more indirect—such as legal treatment, as in

HTSUS, that is substantively related to commercial differences.

The other two inquiries discussed by the parties in this case present greater challenges: at least in this case, they are less tractable than the "commercially different good" inquiry. The inquiry into "*the* essential characteristics," if taken on its own terms and not translated into a marketplace inquiry, requires the assessment of different characteristics of a vehicle for their essentiality. Here, for example, the parties argue about the comparative essentiality of the ability to move down the road and the vehicle parts enabling that function versus the functions made possible by those interior spaces not used for controlling vehicle motion—spaces for carrying cargo from place to place for use when off-loaded or, instead, for providing comforts for use as a residence inside the vehicle. The guides for resolving that debate to determine "the essential characteristics" in this context are not bright.

The "intended use" inquiry presents its own challenges—even aside from uncertainties in the regulatory text. Whose intent counts? At what time? In this case, the participants in the cycle may include a van manufacturer, one or more van sellers in the U.S., one or more van buyers in the U.S., the exporter from the U.S., one or more buyers in Canada, the Canadian van alterer, the importer of the altered vehicle, and the U.S. buyer of the altered vehicle. The van maker at issue advertises the vans to potential customers *both* as suitable for use as sold (*e.g.*, as a familiar cargo hauler) *and* as suitable for modification for another use (*e.g.*, as a motorhome). A U.S. firm might buy a group of vans and export them with the plan to sell some of them for use as is and others for modification (and re-import), but not knowing which possibility will ripen into reality for any particular van.

We do not say that there exist no sound ways to meet the challenges seemingly presented by the "intended use"

inquiry, even in complicated situations. Certainly there are simple situations, like the one involved in *J.D. Richardson* (quite unlike the present case), where, as already noted, a U.S. manufacturer exported its "uncompleted articles," which "*could not* be used in their condition as exported," to be "manufactured into completed articles" for return to the U.S. manufacturer to be used as parts. 36 CCPA at 16, 17 (emphasis added). But the apparent challenges presented by the "intended use" language of subsection (b) are on their face greater for a case like this one—where the exported article is in fact a completed article for consumer use for *some* purposes (traditional cargo carrying)—than those presented by the "commercially different" inquiry.

B

In this case, the undisputed facts make the answer to the "commercially different" question straightforward. The Court of International Trade, in concluding that the imported motorhomes were commercially different from the exported Sprinter vans, relied on "changes to the pricing, the applicable tariff heading, the use, and the name of the vans." *Pleasure-Way*, 2016 WL 6081818, at *5. It determined that the motorhomes "no longer resembled the exported cargo vans," were "no longer classifiable as motor vehicles for the transport of goods," and were sold at "different price points than the exported vehicles." *Id.* Those determinations were proper on this summary-judgment record, and so was the conclusion that the Pleasure-Way motorhomes were commercially different from the Sprinter vans.

Pleasure-Way gave the converted motorhomes new names—the Ascent TS or Plateau TS. It sold them at a price significantly higher than—even double or triple—the market price for Sprinter vans. It marketed the motorhomes as upscale leisure vehicles to be used for vacationing and recreation, while the Sprinter vans were

marketed primarily as cargo vans, with the potential for other uses if they were modified by purchasers. Overall, then, the likely use and consumer base for the Sprinter vans as exported were broadly different from those for the motorhomes imported into the U.S. after leaving Pleasure-Way's Canadian conversion facility. Not surprisingly, the applicable HTSUS tariff classifications are also different for the motorhomes and the Sprinter vans—the motorhomes come under subheading 8703 as vehicles designed for the transport of persons, while the Sprinter vans come under subheading 8704 as vehicles for the transport of goods or cargo. These differences, taken in combination, make the imported motorhomes commercially different goods from the exported Sprinter vans.

Pleasure-Way argues against this conclusion by contending that what constitutes a "commercially different good" should depend on whether the altered good is "identifiable" as the pre-alteration good and that a motorhome is identifiable as the van from which it emerged because the vehicle identification number (VIN) remains. Appellant's Br. at 43–47 (relying on *Press Wireless*). We reject this view. It does not fit the regulation, and it is not supported by *Press Wireless*.

The regulation addresses a universe of situations in which an exported good has been modified to become the later imported good, and it distinguishes some such modifications from others based (as relevant here) on whether the resulting good is commercially different from the original. If so, the favorable duty treatment is unavailable. The basis of distinction—whether the resulting good is "commercially" different from the original—has very little to do with whether it is possible to recognize the original embedded in the altered good. And such identifiability certainly is not a decisive fact, as Pleasure-Way urges—even in the specific situation where there happens to be an unrelated regulatory regime that ena-

bles recognition of origins through assigned information-encoding numbers, such as VINs.

The conclusion that identifiability of the exported good in the re-imported good does not equate to lack of commercial difference is confirmed by the regulation's illustrative example—involving glass mugs tempered and etched abroad that thereby became "commercially different products with distinct new characteristics." 19 C.F.R. § 181.64(a). There is no mention of whether or not the exported mugs could be readily identified in the re-imported products. The example focuses solely on whether the "distinct new characteristics" conferred by tempering and etching changed the commercial nature of the good, *id.*, which depends on the commercial characteristics of the original and resulting goods, not whether one is still discernible in the other.

*Press Wireless*, which involved radio tubes exported for repairs and then reimported into the United States, does not support Pleasure-Way's position. The Customs Court in *Press Wireless* did observe that, while the reimported tubes had a new marking ("T.X. 10-3000"), the original markings of the exported tubes ("S. W.7") could be discerned on the reimported tubes. 6 Cust. Ct. at 104. But the Customs Court hardly stopped at that fact, which merely rebutted the Government's contention that the imported tubes were not the same tubes as the exported ones. The court held that the tubes qualified for favorable duty treatment under the precursor to current subsection (a) because of the limited nature of the foreign processing: "[w]hile abroad the worn-out tubes were restored to a condition which prolonged the use for which they were originally designed," no more, except for some greater efficiency from an improved material for the filament. *Id.* at 105. For the reasons indicated, the change at issue in the present case is quite different as a commercial matter.

Pleasure-Way further suggests that this court's predecessor, in the *Dolliff* case, held that changes in name, price, and classification may not be taken into account when determining whether an imported good is commercially different from its exported precursor. We reject that suggestion. It overstates what *Dolliff* stands for.

As relevant to Pleasure-Way's point, the furthest *Dolliff* goes is one statement that some changes in the "name, appearance, size, shape and use" of a good could be "alterations" within the meaning of a regulation similar to 19 C.F.R. § 181.64(a). *Dolliff*, 599 F.2d at 1018.[2] That statement hardly precludes reliance on the totality of circumstances relevant to commercial differences, including those mentioned in *Dolliff*. Moreover, even the limited statement in *Dolliff* was unnecessary to the court's holding there, which was that the changes at issue were *not* "alterations." *Id.* at 1021. And the court drew *that* conclusion, as we have noted, on the ground now embodied in 19 C.F.R. § 181.64(b), based on *J.D. Richardson*: the foreign processing at issue in *Dolliff*, the court held,

---

[2] *Dolliff* quotes a regulation, which defined "repairs or alterations" in Tariff Schedules of the United States (TSUS) item 806.20, as follows: "The term 'repairs or alterations' shall be held to mean restoration, change, addition, renovation, cleaning, or other treatment which does not destroy the identity of the article exported or create a new or different article." *See* 599 F.2d at 1018. The court in *Dolliff* then said the following about TSUS item 806.20: "Appellant correctly contends that simply because intermediate foreign processing of articles of U.S. origin that are subsequently reimported into the United States results in differences in name, value, appearance, size, shape and use for the articles does not require a conclusion that the foreign processing does not comprise 'alterations' under TSUS item 806.20." *Id.*

was processing "performed on unfinished goods" and led "to completed articles," so "the processing cannot be considered alterations." *Id.* at 1019. The actual decision in *Dolliff*, rejecting the "alteration" characterization, could not aid Pleasure-Way even if it applied to the exported Sprinter vans.

We conclude that Pleasure-Way's motorhomes flunk a necessary requirement for favorable duty treatment under 19 C.F.R. § 181.64 and, therefore, are not properly classifiable under subheading 9802.00.50 of the HTSUS.

## III

For the foregoing reasons, we affirm the judgment of the Court of International Trade.

**AFFIRMED**